Emily Teplin Fox, OSB No. 121720
efox@oregonlawcenter.org
Ryan Newby, OSB No. 114724
rnewby@oregonlawcenter.org
Ed Johnson, OSB No. 965737
ejohnson@oregonlawcenter.org
OREGON LAW CENTER
522 SW 5th Ave, Suite 812
Portland, OR  97204
(503) 473-8310

Angela Sherbo, OSB No. 824472
Angela.S@youthrightsjustice.org
YOUTH, RIGHTS & JUSTICE
1785 NE Sandy Blvd., Suite 300
Portland, OR 97232
(503) 232-2540

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| A.R., a minor child, and B.C., a minor child, by their guardian ad litem RICHARD VANGELISTI; on behalf of themselves and all others similarly situated; and CASA FOR CHILDREN, INC., an Oregon not-for-profit organization, Plaintiffs, v. STATE OF OREGON by and through its DEPARTMENT OF HUMAN SERVICES; CLYDE SAIKI, in his official capacity as Director of the Oregon Department of Human Services; and REGINALD C. RICHARDSON, in his official capacity as Deputy Director of the Oregon Department of Human Services, Defendants. | Case No. 3:16-cv-01895-YY **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** **Pursuant to Fed. R. Civ. P. 65** **Expedited Hearing/Oral Argument Requested** |

# TABLE OF CONTENTS

LR 7-1 CERTIFICATION ................................................................................................... 8

MOTION............................................................................................................................... 8

MEMORANDUM ................................................................................................................ 8

I.    INTRODUCTION ..................................................................................................... 8

II.    FACTUAL AND PROCEDURAL BACKGROUND.................................................... 10

    A.    Oregon must provide children in its custody with permanency and must meet their basic needs, including their mental health needs. ............................................... 10

    B.    Failures in Oregon's foster care system include the failure to adequately provide for foster children's mental health needs........................................................................ 12

    C.    DHS has recently begun to 'place' foster children overnight in hotels, DHS offices, and in at least one instance, a juvenile detention facility, although the child was not charged with any delinquent act. ........................................................................... 14

    D.    DHS' practice of unplacing children deviates from professional norms and causes emotional and psychological harm. ................................................................. 18

    E.    The individual child plaintiffs in this action have been harmed from unplacement and are likely to be harmed further without an injunction................................................. 20

    F.    CASA for Children will suffer irreparable injury without an injunction. ................. 21

    G.    Plaintiffs attempted to resolve this matter without resort to litigation. ..................... 22

III.    ARGUMENT............................................................................................................ 22

    A.    Legal Standard. ...................................................................................................... 22

    B.    Plaintiffs are likely to succeed on the merits; alternatively, they have raised serious questions going to the merits. ................................................................................... 23

        1.    DHS' practice of housing foster children in hotels, offices, and juvenile detention facilities without charge violates children's substantive due process rights. ......... 23

            a.    DHS owes foster children substantive due process rights................................... 23

            b.    DHS' practice of unplacing children shocks the conscience. ............................. 27

        2.    DHS' practice of leaving children unplaced violates disability rights law............. 30

        3.    Defendants' resource limitations do not excuse their conduct. ............................. 36

    C.    The balance of hardships tips sharply in plaintiffs' favor. ......................................... 37

    D.    Granting a preliminary injunction is in the public interest......................................... 38

    E.    Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction. ............................................................................................................. 39

    F.    Plaintiffs' motion warrants statewide relief............................................................. 41

    G.    The Court should waive the bond requirement. ....................................................... 42

IV.    CONCLUSION........................................................................................................ 42

CERTIFICATE OF COMPLIANCE................................................................................... 43

# TABLE OF AUTHORITIES

**Cases**

*A.G. v. Burroughs*, No. 3:13-cv-01051-AC, 2015 US Dist LEXIS 118350 (D. Or. June 22, 2015) ................................................................................................................ 28

*A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195 (9th Cir. 2016)..................... 31

*All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).......................................... 23

*Arc of Cal. v. Douglas*, 757 F.3d 975 (9th Cir. 2014) ................................................................. 41

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ..................................................................... 40

*Braam v. State*, 81 P3d 851(Wash. 2003) ........................................................................... 25, 29

*Cal. Council of the Blind v. Cty. of Alameda*, 985 F. Supp. 2d 1229 (N.D. Cal. 2013) .............. 33

*Chalk v. Orange County Superintendent of Schs.*, 840 F.2d 701 (9th Cir. 1988)....................... 39

*Clark v. Cal. Dep't of Corrs.*, 123 F.3d 1267 (9th Cir. 1997) ...................................................... 32

*Cnty. of Sacramento v. Lewis*, 523 US 833 (1998)............................................................... 23, 27

*Cohen v. City of Culver City*, 754 F.3d 690 (9th Cir. 2014)................................................... 30, 31

*Collins v. City of Harker Heights*, 503 US 115 (1992)................................................................. 23

*Connor B. v. Patrick*, 771 F. Supp. 2d 142 (D. Mass. 2011).................................................. 24, 25

*Dept. of Human Servs. v. T.L.*, 279 Or. App. 673 (2016) ............................................................ 10

*DeShaney v. Winnebago County Dep't of Social Servs.*, 489 US 189 (1989)............................... 24

*Doe v. N.Y.C. Dep't of Soc. Servs.*, 670 F. Supp. 1145 (S.D.N.Y. 1987) ............................. passim

*Duvall v. County of Kitsap*, 260 F3d 1124 (9th Cir. 2001).......................................................... 31

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) ........................ 40, 41

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc., Inc.*, 630 F.3d 1153 (9th Cir. 2011) ........................ 38

*Estelle v. Gamble*, 429 US 97 (1976) .................................................................................... 24, 27

*Featherstone v. Pac. Nw. Univ. of Health Scis.*, No. 1:CV-14-3084-SMJ, 2014 U.S. Dist. LEXIS 102713 (E.D. Wash. July 22, 2014) ............................................................................ 42

*Hearns v. Terhune*, 413 F.3d 1036 (9th Cir. 2005)..................................................................... 28

*Henrietta D. v. Bloomberg*, 331 F3d 261 (2d Cir. 2003).................................................... 32, 35

*Henry A. v. Willden*, 678 F3d 991 (9th Cir. 2012)......................................................... 24, 27, 29

*In re C.A.*, 227 Or. App. 172 (2009) ................................................................................ 11

*Justin v. City of L.A.*, No. CV-00-12352 LGB (AIJx), 2000 U.S. Dist. LEXIS 17881
(C.D. Cal. Dec. 5, 2000) ................................................................................................. 42

*K.H. v. Morgan*, 914 F2d 846 (7th Cir. 1990) ......................................................... 25, 29

*K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013) ................................. 32

*Kenny A. v. Perdue*, No. 1:02-cv-1686-MHS, 2004 U.S. Dist. LEXIS 27025 (N.D. Ga.
Dec. 11, 2004)................................................................................................................. 29

*LaShawn A. v. Dixon*, 762 F Supp 959 (D.D.C. 1991) ............................................. 27, 36

*Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983) ......................................................... 37

*M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015) ........................................... 27, 28

*M.R.* v. *Dreyfus*, 697 F.3d 706 (9th Cir. 2012) ......................................................... 37

*Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996) .................... 25, 35

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)..................................................... 39

*Mont. Fair Hous., Inc. v. City of Bozeman*, No. CV 09-90-BU-RFC-CSO, 2011 U.S. Dist.
LEXIS 153155 (D. Mont. Dec. 7, 2011) ...................................................................... 36

*Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959 (D. Ariz. 2011) ...................... 39, 40

*Penn. Dep't of Corrs. v. Yeskey*, 524 US 206 (1998) .................................................. 32

*R.G. v. Koller*, 415 F. Supp. 2d 1129 (D. Haw. 2006)............................... 25, 29, 37, 41

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ................................................. 38

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002).................... 38

*Shanks v. Dressel*, 540 F.3d 1082 (9th Cir. 2008) ....................................................... 24

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011)............................... 39

*Tamas v. Dep't of Soc. & Health Servs.*, 630 F3d 833 (9th Cir. 2010).................... 24, 27

*Turner v. Vilsack*, No. 3:13-cv-1900 SI, 2013 U.S. Dist. LEXIS 163701 (D. Or. Nov. 18,
2013).......................................................................................................................... 37, 38

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ...................................... 30

4-    PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

*Vanvalkenburg v. Or. Dep't of Corrs.*, No. 3:14-cv-00916-BR, 2016 U.S. Dist. LEXIS 58438 (D. Or. May 2, 2016) ........................................................................... 32

*Vinson v. Thomas*, 288 F.3d 1145 (9th Cir. 2002) ........................................................ 31

*Winter v. Natural Resources Defense Council*, 555 US 7 (2008).......................... 22, 39

*Youngberg v. Romeo*, 457 US 307 (1982) ............................................................... 24, 27

*Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F. 2d 883 (10th Cir. 1992) ................ 27

## Statutes

29 USC § 705 ................................................................................................................. 31

29 USC § 794(a) ............................................................................................................. 31

42 USC § 12102 .............................................................................................................. 31

42 USC § 12131 .............................................................................................................. 31

42 USC § 12132 .............................................................................................................. 30

42 USC § 622(b)(8)(A)(iii) ....................................................................................... 11, 12

42 USC § 675 .................................................................................................................. 11

ORS 339.133 ................................................................................................................... 19

ORS 419A.004(23) .......................................................................................................... 10

ORS 419B.090 ........................................................................................................... 10, 11

ORS 419B.150(1)(a) ....................................................................................................... 10

ORS 419B.183 ................................................................................................................. 10

ORS 419B.185(1)(b) ....................................................................................................... 10

ORS 419B.192 ........................................................................................................... 11, 19

ORS 419B.305 ................................................................................................................. 10

ORS 419B.343 ................................................................................................................. 19

ORS 419B.443 ................................................................................................................. 19

ORS 419B.476 ................................................................................................................. 11

ORS 659A.104 ................................................................................................................. 31

ORS 659A.139 ............................................................................................... 31

ORS 659A.142 ............................................................................................... 31

ORS 659A.142(4) .......................................................................................... 32

ORS 659A.142(5)(c)(A) .......................................................................... 32, 33

**<u>Other Authorities</u>**

Elizabeth Ruiz, *Foster Care Shortage in Jackson County*, KOBI, Sept. 29, 2016 ...................... 15

*Investigation of the Massachusetts Department of Children and Families by the United States Departments of Justice and Health and Human Services Pursuant to the Americans with Disabilities Act and the Rehabilitation Act*, DJ No. 204-36-216 and HHS No. 14-182176 ............................................................................ 34

Kristian Foden-Vencil, *Oregon's Foster Care System Reacts to New Research*, OPB, Aug. 15, 2011, Updated July 17, 2012 .................................................. 12

Kristian Foden-Vencil, *Social Workers Say What It's Like to Deal with Foster Kids Living in the Office*, OPB, July 25, 2016, updated July 27, 2016 ............................................... 14

Kristian Foden-Vencil, *With Foster Care System 'Crisis,' Oregon Puts Kids In Hotel Rooms*, OPB, July 6, 2016, updated July 7, 2016 ................................ 16

Nan Waller, Susie L. Norby, Ricardo J. Menchaca, *Our Children Are Sleeping in State Offices*, Oregonian, Aug. 18, 2016 ........................................... 9

Oregon Dep't of Human Servs., *Sensitive Review Committee Report: Spring 2011 Issues/Recommendations* .............................................................. 13, 28

Oregon Dept. of Human Servs., *2015 Child Welfare Data Book* (2016) .............................. 13, 16

*Oregon Foster Children's Bill of Rights* ....................................................... 11

Oregon House Interim Comm. On Human Services and Housing, Sept. 22, 2016 (video) ... 17, 19

Pecora *et al.*, Improving Family Foster Care: Findings from the Northwest Foster Care Alumni Study (2005) ....................................................................... 12

Public Knowledge, LLC, *Child Safety in Substitute Care Independent Review: Comprehensive Assessment—Draft Findings* (2016) ................................. 13

Substance Abuse and Mental Health Administration, U.S. Dep't of Health and Hum. Servs., *Diagnoses and Health Care Utilization of Children Who Are in Foster Care and Covered by Medicaid* ................................................................ 12

Taylor W. Anderson, *With Foster Care Shortage, Teen Held in Juvenile Detention in Deschutes County*, Bend Bulletin, Aug. 28, 2016 ............................... 15

*Think Out Loud: Foster Care Shortage*, OPB (July 7, 2016) (podcast) ................................. 19, 20

U.S. Dept. of Health and Human Servs., *Statewide Assessment Instrument* (Mar. 25, 2016) ......................................................................................................................... 13, 34

**<u>Rules</u>**

OAR 413-200-0260 ........................................................................................................ 16

**<u>Regulations</u>**

28 CFR § 35.130 ................................................................................................... 32, 33, 34

28 CFR § 35.164 ........................................................................................................ 33

**<u>Constitutional Provisions</u>**

U.S. Const. amend. XIV, § 1 .................................................................................... 23

**LR 7-1 CERTIFICATION**

The undersigned counsel hereby certifies that the parties made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so.   Counsel for defendants object to plaintiffs' request for an expedited hearing.

**MOTION**

Plaintiffs, Oregon foster children and an organization that serves them, move the Court for a preliminary injunction compelling DHS to immediately take steps to end its practice of 'placing' foster children overnight in temporary non-placements such as hotels, offices, and juvenile detention facilities, and to entirely end the practice and find appropriate foster placements in the most integrated, family-like setting possible, within 30 days.

**MEMORANDUM**

**I.    INTRODUCTION**

Tonight, some of the most vulnerable children in the state of Oregon will sleep on temporary cots in state offices; in hotel rooms; in hospitals, despite being medically cleared for discharge; or in juvenile detention facilities, despite the absence of any criminal charge against them.  Some may have spent the day sitting in a DHS office, missing school.  These are children over whom the state has custody.  Several are as young as two years old; many are children with disabilities; all have experienced trauma.  The state has removed these children from their homes despite not having any home to move them to.  As experts in the field agree, the state's practice of rendering foster children effectively homeless is unconscionable.

It is also unlawful.  Plaintiffs, a putative class of current and prospective Oregon foster children and a non-profit organization that serves them, seek a) a declaration that defendants' failure to provide foster placements violates their substantive Due Process rights, and the rights of foster children with mental disabilities under the Americans with Disabilities Act and related

anti-discrimination laws; and b) an injunction prohibiting defendants from housing foster children in temporary non-placement locations such as hotels, DHS offices, hospitals, and juvenile detention facilities without a delinquency or other charge; and compelling defendants to obtain appropriate homes for foster children in the most integrated, family-like setting possible.

As several state court judges recently articulated,[1] the state's failure to find appropriate foster homes has placed the children it is obligated to protect and care for in crisis. Historically, there have been isolated incidents of Oregon's foster children being housed in a hotel or office overnight, in emergency circumstances. But in recent months, Oregon's Department of Human Services ("DHS") has adopted hotels, offices, and other inherently transient facilities as 'placements' in widespread use. In its search for alternative "placements" DHS has even allowed children to remain hospitalized after they were medically ready for discharge.

These locations are not 'placements' under any standard or norm in the realm of foster care. Rather, the children sleeping in places like offices or hotel rooms are 'unplaced.'[2] DHS representatives recently admitted that an average of 3-4 children sleep in a hotel or a DHS office every day, and that such unplaced foster children may miss school. DHS has functionally rendered children in its care homeless. The Court should compel DHS to end its practice of 'unplacing' foster children, pending a judicial determination of the practice's legality.

_____

[1] *See* Nan Waller, Susie L. Norby, Ricardo J. Menchaca, *Our Children Are Sleeping in State Offices*, Oregonian, Aug. 18, 2016, *available at* http://www.oregonlive.com/opinion/index.ssf/2016/08/our_children_are_sleeping_in_s.html.

[2] Defined by the Merriam-Webster dictionary as "not placed: not having a definite or assigned place."

9-    PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Accordingly, plaintiffs move the Court for a preliminary injunction compelling the state to immediately commence ending its practice of rendering children in its custody unplaced, and to end the practice entirely and find appropriate foster homes within 30 days.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Oregon must provide children in its custody with permanency and must meet their basic needs, including their mental health needs.

The statutory basis that permits DHS to take a child into protective custody is broad. ORS 419B.150(1)(a) permits a variety of public officials to take a child into protective custody "[w]hen the child's condition or surroundings reasonably appear to be such as to jeopardize the child's welfare." Once removed, the juvenile court must hold a shelter hearing within one business day, ORS 419B.183, and make findings and orders about the child, including whether to maintain the child in the temporary custody of DHS and whether the provision of reasonable services can prevent or eliminate the need to separate the family.  ORS 419B.185(1)(b). Throughout the dependency process there is an emphasis on both accuracy and speed, a legislative acknowledgment about the serious harm that uncertainty and delay causes children. *See*  ORS 419A.004(23) (defining "reasonable time"); ORS 419B.305.

ORS 419B.090 provides that Oregon children "are individuals who have legal rights." First among the enumerated rights is the right to "[p]ermanency with a safe family." ORS 419B.090(2)(A)(a).  If parents do not make it possible for their child to return to them, then the state must "*create or provide an alternative, safe and permanent home for the child.*" ORS 419B.090(5) (emphasis added); *Dept. of Human Servs. v. T.L.*, 279 Or. App. 673, 678 (2016).

During the time a child is in the custody of DHS, he or she must be placed in the least restrictive, most family-like environment, consistent with the child's needs. *See* 42 USC § 622(b)(8)(A)(iii); 42 USC § 675(5)(A). DHS is obligated to find a safe and permanent home for each child in its custody; each child is entitled to safety, stability and well-being. ORS 419B.090 (3). Placements of foster children in Oregon "are on a continuum: placement with parents as the most preferred, followed by placement with a relative, community based foster care, congregate or group care, and finally, placement in residential treatment (often secure facilities)." (Decl. of Lynn Travis ("Travis Decl.") ¶ 19.) ORS 419B.192(1), 419B.192(2).

In Oregon, the only recognized permanent plans are: return home; adoption; legal guardianship; placement with a fit and willing relative; and, only for wards 16 years of age or older, "another planned permanent living arrangement." ORS 419B.476 (5) (c)-(g). The last is highly disfavored. *In re C.A.*, 227 Or. App. 172, 183–84 (2009). Neither federal nor state law contemplates unplanned temporary living arrangements such as a hotel or office cot. "I HAVE THE RIGHT . . . TO HAVE WHAT EVERY CHILD NEEDS[,]" the Foster Children's Bill of Rights declares, including a "home where I am part of the family and am treated as such" and a "safe and appropriate sleeping arrangement . . . ."[3]

Most children in DHS' custody are, by the very nature of their circumstances, already traumatized. (Decl. of Anthony Urquiza ("Urquiza Decl."), ¶ 8.) Children with severe emotional, behavioral, developmental and cognitive disabilities ("mental disabilities"), however, represent a large portion of those served by the foster care system. A recent analysis of children

---

[3] *Available at* https://aix-xweb1p.state.or.us/es_xweb/DHSforms/Served/de9014a.pdf.

in foster care on Medicaid revealed that 49.4% had made claims to Medicaid for treatment of a

mental illness.[4] A study of Oregon and Washington youths leaving foster care showed 54.4% of

them had symptoms of at least one mental disorder.[5]  DHS must plan for identifying the health

needs, including the mental health needs, of children in its care.  42 USC § 622(b)(15)(i-vii).

### B.  Failures in Oregon's foster care system include the failure to adequately provide for foster children's mental health needs.

Recent reports on Oregon's child welfare services have described several systemic

conditions negatively affecting the agency's ability to care for children.  These issues include a

high rate of removal, frequent moves, and lack of adequate mental health services.

As of 2011, Oregon placed children in foster care at *twice* the national rate.[6]  In 2015,

11,238 children spent at least one day in foster care in Oregon.[7]  In addition to being more likely

to end up in foster care, children in DHS custody are also moved more frequently than children

in foster care nationally.  Between April 1, 2014, and March 31, 2015, for example, Oregon had

6.31 moves per 1000 days of foster care.  This is almost 50% higher than the national standard of

---

[4] Substance Abuse and Mental Health Administration, U.S. Dep't of Health and Hum. Servs., *Diagnoses and Health Care Utilization of Children Who Are in Foster Care and Covered by Medicaid*, at 5 available at https://store.samhsa.gov/shin/content/SMA13-4804/SMA13-4804.pdf. This study also found nine percent of foster children had a developmental disability.

[5] Pecora *et al.*, Improving Family Foster Care: Findings from the Northwest Foster Care Alumni Study (2005), at 32 *available at* http://www.casey.org/media/AlumniStudies_NW_Report_FR.pdf.

[6] Kristian Foden-Vencil, *Oregon's Foster Care System Reacts to New Research*, OPB, Aug. 15, 2011, Updated July 17, 2012, available at http://www.opb.org/news/article/oregons-foster-care-system-reacts-new-research/.

[7] Oregon Dept. of Human Servs., *2015 Child Welfare Data Book*, 2 (2016) ("2015 *Child Welfare Data Book*"), available at https://www.oregon.gov/DHS/CHILDREN/CHILD-ABUSE/Documents/2015-cw-data-book.pdf.

4.2.[8]  In 2015, 40% of Oregon's foster children had over two placements.  (*2015 Child Welfare Data Book* at 17.)  Research "highlights [that] multiple placements and perceptions of placement insecurity" lead to further mental health and placement disruptions.  (Urquiza Decl. ¶ 21.)

DHS has long known about its poor record of placement instability for foster children in its care.  In 2011, DHS conducted a self-review and concluded that Oregon was seriously failing in its obligation to provide placement stability, and admitting that repeated placement moves "inflict emotional harm on foster children."[9]  Yet, the problem of placement insecurity persists. More than 11% of Oregon's foster children went through *six* or more placements in the last year. (*Statewide Assessment* at 22.)  Despite the dire conclusions of DHS' 2011 report and intentions of self-reform, the problem of foster care placements has "not improved over the past five years." (*Id.* at 23.)  And ineffective data collection compounds existing problems at DHS.[10]

The many children with mental disabilities in Oregon's foster care system, moreover, lack access to appropriate outpatient and inpatient mental health care.  A recent report on conditions in DHS custody reported that placements for high-need children were "shrinking[.]" (*Public Knowledge Report* at 29; *Statewide Assessment* at 50-51.)

---

[8] U.S. Dept. of Health and Human Servs., *Statewide Assessment Instrument*, at 22 (Mar. 25, 2016) ("*Statewide Assessment*"), available at https://www.oregon.gov/DHS/CHILDREN/Documents/cfsr-or-statewide-assess-2016.pdf .

[9] Oregon Dep't of Human Servs., *Sensitive Review Committee Report: Spring 2011 Issues/Recommendations*, at 5, *available at* https://www.oregon.gov/DHS/CHILDREN/CHILD-ABUSE/CIRT/src_report_5-11.pdf ("*Sensitive Review Committee Report*").

[10] Public Knowledge, LLC, *Child Safety in Substitute Care Independent Review: Comprehensive Assessment—Draft Findings* 5 (2016), available at https://www.oregon.gov/DHS/DHSNEWS/CWIndependentReview/draft-findings.pdf ("*Public Knowledge Report*").

13-    PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

It is in this context – a flawed, overburdened foster care system that is not meeting its obligations to children already in its custody, yet continues to remove children at an unusually high rate  –  that the practices plaintiffs challenge in this lawsuit came into existence.

> **C. DHS has recently begun to 'place' foster children overnight in hotels, DHS offices, and in at least one instance, a juvenile detention facility, although the child was not charged with any delinquent act.**

This summer, professionals and volunteers involved with Oregon's child welfare observed a trend they found disturbing.  Instead of placing foster children with a relative, in a community-based home, or in one of the other placements on the accepted "continuum" described above, DHS has been leaving children in its custody unplaced.  These unplaced children often spend their days in a DHS office, only to spend the night in a hotel with DHS caseworkers, or in a state office on a cot or aero-mattress such as this:[11]



---

[11] Kristian Foden-Vencil, *Social Workers Say What It's Like to Deal with Foster Kids Living in the Office*, OPB, July 25, 2016, updated July 27, 2016, available at http://www.opb.org/news/article/oregon-foster-care-social-workers-in-office/ ("Foden-Vencil, *Social Workers*").

14-    PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

The program director and legal counsel for plaintiff CASA for Children, who has spent nearly three decades in the realm of foster care and spends much of her professional existence discussing placements of Oregon foster children, first heard of a child being housed in a hotel or a state office building in Oregon in late June 2016. (Decl. of Lynn Travis ("Travis Decl.") ¶¶ 1, 3, 7, 9, 23.) Both practices have accelerated. (*Id.* ¶ 24.) Indeed, the Washington County DHS office has converted part of a visitation center to accommodate children overnight. (*Id.* ¶ 25.) Jackson County did, too.[12] Of converting Jackson County DHS office space into emergency housing for children, a DHS representative stated, "We knew our time was coming." (*Id.*)

It appears DHS has even turned to juvenile detention facilities for unplaced foster children. One child in DHS custody recently spent nearly a month in a juvenile detention facility in Deschutes County, without any pending delinquency charges.[13] And DHS' own data reflects that it has allowed children to remain hospitalized after they were medically ready for discharge due to a dearth of placement. (*See, e.g.*, Decl. of Angela Sherbo ("Sherbo Decl."), Ex. 5 (Early Data Spreadsheet) at 9 (entry with note stating "[c]hained to bed as required by hospital staff. . . . No placement was available").) Another entry from DHS' own spreadsheet states that a child "was sent home to mom [from psychiatric hospital] due to the fact that we (DHS) were not able to find a placement for him (they had been ready to discharge him for a long time)." (*Id.* at 10.)

---

[12] Elizabeth Ruiz, *Foster Care Shortage in Jackson County*, KOBI, Sept. 29, 2016, *available at* https://kobi5.com/news/foster-care-shortage-in-jackson-county-37116/.

[13] *See* Taylor W. Anderson, *With Foster Care Shortage, Teen Held in Juvenile Detention in Deschutes County*, Bend Bulletin, Aug. 28, 2016, *available at* http://www.bendbulletin.com/localstate/4610335-151/with-foster-care-shortage-teen-held-in-juvenile.

15-    PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

In rendering children unplaced, DHS is not holding itself to the standards it imposes on others caring for children.  If a parent fails to provide adequate housing for her child, she might well be subject to DHS intervention in Oregon.  (*2015 Child Welfare Data Book*, at 14 (citing "Inadequate Housing" as a basis for removal in 13% of cases).)  But inadequate housing is precisely what DHS is providing unplaced children in its custody.  To house and care for foster children in Oregon, people, agencies, and their homes must obtain certification from DHS.  *See* OAR 413-200-0260 et seq. (setting forth prerequisites and responsibilities for certification).  Yet DHS is allowing unplaced children to sleep in presumably uncertified locations such as hotels and offices, and be supervised by individuals who may not be certified foster parents.

It is unclear exactly how many Oregon foster children have been unplaced, in which non-placement (hotel, state office, hospital, or juvenile detention facility) they have spent the night, or how long and how often they have been unplaced.  In late July, DHS publicly stated that it was housing an average of six foster children per week in a hotel or office, but a "quick DHS survey" weeks earlier found nine children unplaced in a single day.[14]  One day in August, Washington County DHS anticipated 6-8 children sleeping in its office.  (Travis Decl. ¶ 26.)

All indications point to increasing momentum.  In response to requests from plaintiffs' counsel, DHS produced in late August several spreadsheets purporting to track the unplaced foster children in its custody.  (*See* Sherbo Decl. ¶ 8, Exs. 5 (Early Data Spreadsheet), 6 (Recent Data Spreadsheet), 7 (2016 Instances Spreadsheet).)  Those spreadsheets are incomplete and

---

[14] Kristian Foden-Vencil, *With Foster Care System 'Crisis,' Oregon Puts Kids In Hotel Rooms*, OPB, July 6, 2016, updated July 7, 2016, *available at* http://www.opb.org/news/article/temporary-housing-for-foster-kids-in-crisis/; *see also* Foden-Vencil, *Social Workers*.

difficult to decipher.[15]  However, they reflect that, historically, there were rare occasions when Oregon foster children spent a night or two in a hotel room or office, but the practice has become prevalent in recent months. Specifically, DHS' data appears to reflect 19 instances of children staying overnight in a DHS office or hotel between January 2014 and February 2016.[16]  (Sherbo Decl., Ex. 5 (Early Data Spreadsheet).)  But DHS counted *60 instances between June 1 and August 15, 2016 alone*. (Sherbo Decl., Ex. 7 (2016 Instances Spreadsheet).)  August's unplaced foster children identified by DHS include two-year-olds, and a child who spent six days living in an office in Washington County.  (Sherbo Decl. ¶ 12; Ex. 6 (Recent Data Spreadsheet).)  On September 22, defendant Saiki reported an average of 3-4 'hoteled' foster children *nightly*.[17]

    The figures above are conservative.  DHS' spreadsheets exclude reference to any child sleeping in a juvenile detention facility, although at least one such incident has been publicly reported and not denied by DHS.  Moreover, DHS' spreadsheets do not reflect at least two of the hotel stays experienced by the individual plaintiffs in this action this summer.  (Sherbo Decl. ¶¶ 11, 13; Decl. of Richard Vangelisti ("Vangelisti Decl.") ¶ 13.)

---

    [15] For example, on Early Data Spreadsheet, there are 25 instances in which the incident start date was identified as "historically," without clarification about the actual date(s) or whether the child spent the night in an office or hotel.  Many children were included in this spreadsheet who do not appear to have stayed overnight in a DHS office or hotel, but who may have spent time (e.g. "5-7 hrs") in a DHS office during the day.  There were five children listed as having stayed in a DHS office for one day on September 2, 2016; the spreadsheet, however, was sent on August 24, 2016.  (Sherbo Decl. ¶ 8.)

    [16] This figure does not include the 25 "historical" entries, which are not clearly overnight stays, and have no time frame, or other entries with no date or that do not appear to be overnight 'placements' but rather multi-hour office stays during the day.  It does include the children listed with the clearly incorrect incident date listed as September 2, 2016.

    [17] Oregon House Interim Comm. On Human Services and Housing, Sept. 22, 2016 (video), at 02:33:00, available at http://oregon.granicus.com/MediaPlayer.php?view_id=6&clip_id=22075 ("*House Comm. Video*").

Based on the data DHS provided, it appears that DHS particularly struggles to place foster children with mental disabilities, and that they are therefore far more likely to be unplaced than foster children without mental disabilities.  Indeed, DHS titled its spreadsheet on earlier incidents of unplacing children "*Hard to Place*/Hoteling Report."  (Sherbo Decl., Ex. 5 (Early Data Spreadsheet) (emphasis added).)  A great many of the entries on that spreadsheet include a checkmark or a "yes" under "MH/Psyh" as a reason for placement in an office or hotel.  Others not indicated with mental health issues are marked "BRS" as a reason for the non-placement. "BRS" is a common acronym for DHS's Behavioral Rehabilitation Services.  Some, not marked for either BRS or mental health, are indicated as having a developmental disability.  Still more have none of the disability-related reasons checked off, but notes indicate the presence of an emotional, behavioral, or cognitive disability: e.g., "special needs."  In short, a strong majority of Oregon's unplaced children have significant mental disabilities.

### D. DHS' practice of unplacing children deviates from professional norms and causes emotional and psychological harm.

DHS' practice of rendering foster children unplaced is not part of any acceptable standard or norm in the realm of child welfare.  As CASA for Children's program director, who has spent nearly three decades immersed in Oregon's foster care system, and talked with hundreds of child welfare workers, attorneys, judges, and CASAs about children in foster care, explained, "[t]he practice of housing children in state offices or hotels has never been mentioned as an appropriate placement, by anyone I have encountered in any context."  (Travis Decl. ¶ 21.)  "Quite simply, it is not a practice considered acceptable in the foster care field.  And it is not part of the consensus in Oregon about how to treat foster children."  (*Id.* ¶ 22.)

Plaintiffs' expert Mark Hardin, a national expert who has participated or helmed the development of national standards and norms for the treatment of foster children, agrees. (Decl. of Mark Hardin ("Hardin Decl."), ¶ 8.) So does defendant Reginald Richardson, currently in charge of DHS' child welfare services, who stated publicly that DHS does not believe any child should stay in a hotel overnight.[18]  Likewise, on September 22, defendant Clyde Saiki stated that "hoteling" is "not appropriate" for "even one child"; and he noted the "tremendous strain" imposed on caseworkers who serve unplaced children. *House Comm. Video* at 2:33:00-35:00. One experienced social worker recently described openly weeping as she told a court she could not help a foster child sleeping on the floor of a DHS office. (Travis Decl. ¶ 46.) The child's request to the court, "for someone to love her[,] . . . chilled me to the bone." (*Id.*)

DHS' practice of rendering foster children unplaced risks their well-being. As Dr. Anthony Urquiza, plaintiffs' child psychology expert, explains, DHS' unplacing practice "creates serious emotional and psychological harm to the vulnerable children in dependency." (Urquiza Decl. ¶ 15.) CASA for Children's program director, who has dedicated her career to serving Oregon's foster children and knows them well, calls it "extremely harmful to foster children's mental health and development." (Travis Decl. ¶ 30.)

Beyond the emotional and psychological risks of being unplaced is the danger of falling behind educationally. Oregon law recognizes the importance of education to a foster child and also understands that school stability is a major factor in achieving educational success. *See, e.g.*, ORS 419B.192(3)(c); ORS 339.133(4)(A-B); ORS 419B.343(4); ORS 419B.443(1)(d). Dr.

---

[18] *Think Out Loud: Foster Care Shortage*, OPB (July 7, 2016) (podcast) ("*Think Out Loud* podcast"), *available at* http://www.opb.org/radio/programs/thinkoutloud/segment/keeping-young-in-klamath-falls-women-firefighters-foster-care-shortage/.

Richardson, however, has acknowledged that sometimes caseworkers do not have the resources

to transport children who are staying in hotels or DHS offices to school.  Instead, those children

remain in the DHS office during the day, as caseworkers attempt to both do their jobs and keep

the children occupied.  *See Think Out Loud podcast.*  Unplaced children risk missing school.

### E. The individual child plaintiffs in this action have been harmed from unplacement and are likely to be harmed further without an injunction.

Plaintiff B.C. is a six-year-old child who has been in DHS' custody since May 18, 2016.

(Vangelisti Decl. ¶ 5.)  She has a history of abuse by her mother.  (*Id.* ¶¶ 9-10.)  Already upon

first entering DHS' custody, B.C. had severe mental health challenges.  She has been diagnosed

with post-traumatic stress disorder, adjustment disorder with mixed disturbance of emotions and

conduct, anxiety disorder, unspecified, disruptive behavior disorder and physical abuse of a

child, victim.  (*Id.* ¶ 7.)  As Dr. Urquiza explains about traumatized children such as B.C.,

"involvement in foster care is a critical point" which "ideally leads to intervention and recovery"

but can lead to "a downward spiral of mental health."  (Urquiza Decl. ¶ 10.)

Upon obtaining custody of B.C., DHS handled this "critical point" in her life by 'placing'

B.C. in *at least eight different places and with at least 20 caregivers in her first two months* of

custody.  (Vangelisti Decl. ¶¶ 5, 15.)  B.C. was placed in two relative foster homes and one non-

relative foster home; she was housed for one or more nights in *at least three different hotels*

(possibly more), with as many as 15 different caseworkers; she was admitted at least once for an

overnight stay in a hospital; and she had a ten-day stay in a children's psychiatric ward.  (*Id.*)

The instability of B.C.'s life and particularly her most recent experience of DHS placing

her in eight different locations in two months has had, and continues to have, a seriously

detrimental impact on her health and well-being. (*Id.* ¶ 15.)  The discharge sheet from B.C.'s time on a psychiatric ward speaks volumes, and confirms what "should be obvious to [DHS] administrators and any social service professional[,]" (Urquiza Decl. ¶ 25), namely that shuttling a traumatized child with existing mental disabilities between eight different placements and non-placements makes a bad mental health crisis even worse. (*See* Vangelisti Decl. ¶¶ 15-16.)

Plaintiff A.R. is a 4-year-old girl who was removed from her parents and committed to DHS in March, 2014, when she was 20-months-old and her brother 5-months-old. (Vangelisti Decl. ¶ 18.)  She and her brother were placed together in a foster home in April 2014, where she remained until August 16, 2016 and he still remains. (*Id.*)  A.R. has been diagnosed with adjustment disorder with mixed disturbance of emotions and conduct and mixed receptive-expressive language disorder, and can be impulsive. (*Id.* ¶ 19-21.)  In the few months preceding June of 2016, A.R.'s impulsivity increased. (*Id.* ¶ 20.)  She left her long-term foster home and was placed in a non-relative foster home for approximately ten days. (*Id.* ¶ 22.)  Thereafter, A.R. was sent to a hotel with DHS staff for three nights. (ECF No. 5 (Am. Compl.) ¶ 84.)

Both children are likely to be unplaced again, resulting in further damage, unless this practice ends immediately. (Vangelisti Decl. ¶¶ 17, 24.)  As DHS' own data bears out, one instance of unplacement strongly predicts another. (Urquiza Decl. ¶¶ 22-25.)

### F.  CASA for Children will suffer irreparable injury without an injunction.

Plaintiff CASA for Children is a non-profit organization that recruits, trains, and supports volunteers to advocate for children under the protection of the court; its mission is to pursue, for each child, safe and expedited permanency. (Travis Decl. ¶¶ 2, 32.)  DHS' unplacing practice has frustrated the group's mission, and diverted its limited resources towards remediating the

21-   PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

effects of unplacement.  (*Id.* ¶¶ 35-40.)  For example, one child CASA serves was moved from respite foster care, to a motel, to an emergency room in June, only to spend *nearly the entire month of July* in one or more motels.  (*Id.* ¶ 42.)  The child's placement instability, and stays in hotel or motel rooms, required the CASA volunteer assigned to him to spend far more than the normal 5-10 hours a month and to focus on meeting the child's basic needs instead of supporting safe and expedient permanency.  (*Id.* ¶¶ 43-44.)  Unless the practice ends statewide, CASA will continue to lose dozens of staff and volunteer hours addressing the crisis.  (*Id.* ¶¶ 47-48.)

### G.  Plaintiffs attempted to resolve this matter without resort to litigation.

Plaintiffs attempted to resolve this matter without resort to litigation.  Since August 16, 2016, plaintiffs' counsel have sent DHS numerous letters, offers to meet including outside regular business hours, and warnings of potential litigation.  (Sherbo Decl., Ex. 1 (Aug. 16, 2016 letter); Ex. 2 (Aug. 19, 2016 emails); Ex. 3 (Aug. 25, 2016 emails); Ex. 4 (Aug. 29, 2016 letter).) Throughout they have emphasized the urgency of the situation.  (*Id.*)  Despite subsequent meetings, the parties have been unable to resolve their dispute.  (Sherbo Decl. ¶ 7.)  Accordingly, plaintiffs have instigated this action to compel DHS to end its practice of unplacing children.

## III.   ARGUMENT

### A.  Legal Standard.

A plaintiff seeking a preliminary injunction generally must show that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 US 7, 22 (2008).  The Ninth Circuit, however, applies a "sliding scale" approach to the issuance of preliminary injunctions, pursuant

PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

to which "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Here, all four factors militate strongly in favor of granting a preliminary injunction.

> **B.  Plaintiffs are likely to succeed on the merits; alternatively, they have raised serious questions going to the merits.**

First, plaintiffs are likely to succeed on the merits of their substantive due process claim and their disability rights claims; they have at least raised serious questions going to the merits.

> **1.  DHS' practice of housing foster children in hotels, offices, and juvenile detention facilities without charge violates children's substantive due process rights.**

Plaintiffs will be able to prove that the State's practice of moving children to DHS offices, hotels, and jails violates children's substantive due process rights. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment "guarantee[s] more than fair process." *Cnty. of Sacramento v. Lewis*, 523 US 833, 840 (1998) (internal quotations and citations omitted). It also "bar[s] certain government actions regardless of the fairness of the procedures used to implement them . . . ." *Id.* (internal quotations and citations omitted). A substantive due process claim generally requires a showing that the challenged government conduct was conscience shocking. *See Collins v. City of Harker Heights*, 503 US 115, 128 (1992).

> **a.  DHS owes foster children substantive due process rights.**

"To state a substantive due process claim, the plaintiff must show as a threshold matter that a state actor deprived [him] of a constitutionally protected life, liberty or property interest." *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008).  While the Fourteenth Amendment generally "does not confer any affirmative right to governmental aid[,]" an exception exists for situations involving a "special relationship" between a plaintiff and the state. *Henry A. v. Willden*, 678 F3d 991, 998 (9th Cir. 2012); *see also DeShaney v. Winnebago County Dep't of Social Servs.*, 489 US 189, 200 (1989).  The Supreme Court has found such a relationship between the state and prisoners, *see Estelle v. Gamble*, 429 US 97 (1976), and between the state and people with developmental disabilities involuntarily institutionalized, *Youngberg v. Romeo*, 457 US 307 (1982).  Likewise, "[i]t is . . . clearly established that this special relationship doctrine applies to children in foster care." *Henry A.*, 678 F3d at 1000.  *See also Connor B. v. Patrick*, 771 F. Supp. 2d 142, 160 (D. Mass. 2011) (observing that "courts have found, with apparent unanimity, that such a [special] relationship exists in the foster-care context" and citing representative cases).  There is ample precedent to support a due process claim here.

Although they vary in their articulation of the contours of the substantive due process rights states owe foster children, courts hold, with apparent uniformity, that the Fourteenth Amendment requires states to meet foster children's basic needs, including safety and care. *See, e.g.*, *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010) ("Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care[.]") (internal quotations omitted); *Doe v. N.Y.C. Dep't of Soc. Servs.*, 670 F Supp 1145, 1172 (S.D.N.Y. 1987) (foster children have a substantive due process interest in "minimally adequate food, clothing, shelter, medical care,

safety, freedom from bodily restraint and reasonable training to ensure the latter two rights"); *Braam v. State*, 150 Wash. 2d 689, 700, 81 P3d 851, 857 (2003) ("[F]oster children have a constitutional substantive due process right to be free from unreasonable risks of harm and a right to reasonable safety. . . . [The State] must provide conditions free of unreasonable risk of danger, harm, or pain, and must include adequate services to meet the basic needs of the child.").

Courts considering claims specifically involving foster children's mental health consistently conclude that the state must avoid taking action that will result in injury to their psychological and emotional well-being. *See, e.g.*, *K.H. v. Morgan*, 914 F.2d 846, 850 (7th Cir. 1990) ("If . . . the defendants must have known they were placing K.H. in a sequence of foster homes that would be destructive of her mental health, the ingredients of a valid constitutional claim are present."); *Connor B*., 771 F. Supp. 2d at 161 (sustaining claims based in part on a substantive due process right to "a living environment that protects foster children's physical, mental and emotional safety and well being"); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1156 (D. Haw. 2006) (protected liberty interest of children adjudicated delinquent and involuntarily committed to a state institution "encompasses a right to protection from psychological as well as physical abuse"); *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) (Children in state custody "have a substantive due process right to be free from unreasonable and unnecessary intrusions into their emotional well-being.").

In a case concerning remarkably similar factual circumstances to those at issue here, the court in *Doe* evaluated the substantive due process rights of foster children who "are repeatedly kept in city offices during the day, don't know where they will sleep at night and carry their possessions from place to place in plastic garbage bags." 670 F. Supp. at 1146. The children's

individual stories in *Doe* revealed that, for them, "entering foster care has virtually meant joining

the ranks of New York's homeless." *Id.* at 1154.  The *Doe* court's condemnation of the "night-

to-night program," which it found unconstitutional, reflected its devastating impact on children

already vulnerable and traumatized by removal:

> The overnight system's inherent instability as well as its inevitable lack of any
> coordinated supervision of basic needs or support has resulted in physical, emotional and
> psychological harm to the children exposed to it.  Children are by their nature in a
> developmental phase of their lives.  If they do not move forward, they move backward.
> Positive efforts are necessary to prevent stagnation, which, for children, is synonymous
> with deterioration.  The evidence indicates an even more egregious situation.  The
> problems of children who participate in repeated overnights are exacerbated by the
> experience.  Children . . . have, in the past, not been sent to school.  Children who are
> found to be in need of supervision are unsupervised and go AWOL.

*Id.* at 1175.

The same is true here.  DHS' practice of rendering children in its custody itinerant

violates their substantive due process right to have their basic needs met.  The practice is

deleterious to their emotional and psychological well-being.  (Urquiza Decl. ¶¶ 15-21.)  They are

"deprived of the primary source from which they might manage and alleviate their distress – the

warmth and security provided by a consistent and responsive caregiver."  *Id.* ¶ 16.  Instead, "[i]n

addition to sleeping in a strange (by definition, temporary) hotel room or cot, they spend their

days waiting in a state office as their caseworker tries to find foster parents to take them."

(Travis Decl. ¶ 28.)  Unplacing children "is a dehumanizing pattern of behavior that fails to

recognize the unique needs" of Oregon's foster children.  (Urquiza Decl. ¶ 17.)  As set forth

above, Oregon's unplaced foster children experience the same short and long-term negative

mental health consequences endured by the children in *Doe*.  670 F. Supp. at 1176.  Unlike in

*Doe*, however, Oregon's foster children are not only shuttled between DHS offices during the

day and hotel rooms or office cots at night; some have also been incarcerated or hospitalized.

In sum, the Amended Complaint and record before the Court establishes A.R. and B.C.'s substantive due process rights to minimally adequate care, safety, and avoidance of mental harm.

### b. DHS' practice of unplacing children shocks the conscience.

The ultimate inquiry in any substantive due process claim is whether the challenged conduct is conscience-shocking. *Lewis*, 523 US at 850. In the Ninth Circuit, courts addressing foster children's substantive due process claims evaluate defendants' culpability under the "deliberate indifference" standard derived from the Supreme Court's decision in *Estelle*, 429 US 97.[19] *See Henry A.*, 678 F3d at 1000-1001; *Tamas*, 630 F3d at 844. Under that standard, the plaintiff must establish: (1) an objectively substantial risk of harm; and (2) "a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and (a) the official actually drew that inference or (b) that a reasonable official would have been compelled to draw that inference." *Henry A.*, 678 F3d at

---

[19] The appropriate standard governing the question of whether a state's treatment of foster children is conscience-shocking is the "professional judgment" standard derived from *Youngberg*, 457 US 307, a case concerning the due process rights of institutionalized individuals with developmental disabilities. "After all, foster children bear a closer resemblance to the patient in *Youngberg* than the prisoner in *Estelle*[.]" *M.D. v. Abbott*, 152 F. Supp. 3d 684, 699 (S.D. Tex. 2015). "[F]oster children," the Tenth Circuit explained in deciding to apply the "professional judgment" standard to their substantive due process claims, "like involuntarily committed patients, are 'entitled to more considerate treatment and conditions' than criminals." *Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F. 2d 883, 894 (10th Cir. 1992) (quoting *Youngberg*, 457 US at 321-22 ). Under *Youngberg*, plaintiffs must prove a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 US at 323. Plaintiffs preserve for appeal their assertion that the *Youngberg* standard should apply to foster children's substantive due process claims.

Cases, however, "often come out the same regardless of which standard is applied." *M.D.*, 152 F Supp 3d at 699. *See also LaShawn A. v. Dixon*, 762 F Supp 959, 997 n.30 (D.D.C. 1991). Accordingly, while plaintiffs will analyze their due process claim under the *Estelle* "deliberate indifference" standard pursuant to *Tamas* and *Henry A.*, cases applying both standards remain instructive.

1001 (quotations omitted). "Subjective knowledge of a substantial risk of serious harm may be inferred from the fact that the risk of harm is obvious." *A.G. v. Burroughs*, No. 3:13-cv-01051-AC, 2015 US Dist LEXIS 118350, at *8 (D. Or. June 22, 2015) (quotations omitted).

"Deliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005) (internal quotations omitted). Plaintiffs readily meet that standard. Regarding the first prong of the "deliberate indifference" inquiry, here there is an objectively substantial risk of emotional and psychological harm from unplacement. (Urquiza Decl. ¶ 21.) As to the second prong, DHS self-identified a placement stability problem since at least 2011, when it admitted that placement instability harms children. (*Sensitive Review Committee Report* at 5.) Moreover, "[r]easonable government officials should be aware of the risk created if they persistently violate statutory and regulatory duties imposed upon them, particularly when those duties are meant to protect the well-being of foster children in the state's care." *A.G.*, 2015 U.S. Dist. LEXIS 118350, at *10. "A reasonable official would understand that failure to fulfill those duties could result in a substantial risk of serious harm." *Id.* at *10-*11. (*See also* Urquiza Decl. ¶ 22.)

Courts have found "deliberate indifference" toward foster children where, among other practices, government actors: "frequently move[] children from one caregiver to another" and place them in CPS facilities inadequate for their needs; *M.D.,* 152 F Supp 3d at 813; "place unrelated children of different ages, services levels, and genders in the same facility, without nighttime supervision or a sufficient number of trained staff[,]" *id.* at 820; fail to stop "a relentless campaign of harassment" against residents of a juvenile facility "based on their sexual

orientation[;]" *R.G.*, 415 F Supp 2d at 1156; and fail "to provide adequate medical care" or "monitor the administration of medication" to a foster child, *Henry A.*, 678 F3d at 1001. *See also Henry A.*, 678 F.3d at 1001 ("ignoring the instructions of a treating physician . . . can amount to deliberate indifference").

Likewise, courts consistently find conscience-shocking due process violations arising out of placement instability for foster children. *See, e.g.*, *Kenny A. v. Perdue*, No. 1:02-cv-1686-MHS, 2004 U.S. Dist. LEXIS 27025, at *17 (N.D. Ga. Dec. 11, 2004) (officials "failed to provide a sufficient number and array of placements for foster children, . . . [instead placing] children in inappropriate and overcrowded homes, unnecessarily shuffl[ing] them from one unsuitable home to another, and overus[ing] institutional placements"); *Braam*, 150 Wash. 2d at 699-700 (exposing foster children who have endured three or more placements may violate due process if it exposes them to "an unreasonable risk" or "mental damage"). *See also K.H. v. Morgan*, 914 F.2d at 851 ("[T]he Constitution requires the responsible state officials to take steps to prevent children in state [custody] . . . from deteriorating physically or psychologically.").

The at issue here are as egregious, if not more egregious, than those at issue in the cases cited above. More than just frequently moving foster children between actual placements as in *M.D.* or *Braam*, here DHS is moving them into places that are by their nature intentionally transient. The "placements" at issue in this case are not placements at all. The mental and psychological harm of having the state obtain custody of a child only to render him functionally homeless rivals the medical failures in *Henry A.* and the emotional trauma in *R.G.*

As Dr. Urquiza has explained, children in foster care are at a "critical point" where they risk "a downward spiral of mental health" absent appropriate placement and other interventions.

(Urquiza Decl. ¶ 10.)  "At a time when they are most vulnerable[,]" unplacing is "a social service response which is opposite from that which they need."  (*Id.*)  And the inappropriateness of the practice "should be obvious" to those involved in the foster care system.  (Urquiza Decl. ¶ 25.)

Considering the same type of practice at issue in this case, the court in *Doe* concluded that the "overnight" program violated children's due process rights.  670 F. Supp. at 1184.  The individual child plaintiffs have presented an equally compelling claim.  And because DHS' unplacing has frustrated CASA for Children's mission and diverted its resources (Travis Decl. ¶¶ 34-40), it too may challenge the practice.  *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018–19 (9th Cir. 2013).   Unplacing is an unconstitutional practice that DHS must end.

### 2.  DHS' practice of leaving children unplaced violates disability rights law.

The practices challenged in this litigation pose a danger to all foster children at risk of being unplaced.  But the problem is particularly acute for foster children with mental disabilities. Plaintiffs' Amended Complaint and the evidentiary record establishes those children's entitlement to temporary injunctive relief based on their disability discrimination claims.

Under Title II of the Americans with Disabilities Act, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC § 12132.  Under Title II, a plaintiff must prove "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) this exclusion, denial, or discrimination was by reason of his disability."  *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014).

The federal Rehabilitation Act contains similar provisions, 29 USC § 794(a), and is frequently analyzed together with the ADA. *See, e.g.*, *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1203 (9th Cir. 2016); *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002) (as a general matter "there is no significant difference in the analysis or rights and obligations created by the two Acts").[20]  Oregon law likewise prohibits disability discrimination by state entities, ORS 659A.142(5)(a), and is construed consistent with analogous federal law to the extent possible. *See* ORS 659A.139(1).

With regard to the first prong of the analysis, the individual child plaintiffs are individuals with disabilities.  "Disability" under the ADA must "be construed in favor of broad coverage of individuals . . . ."  42 USC § 12102(4)(1)(A).  "Disability" means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities.  42 USC § 12102(1)(A); *see also* 29 USC § 705(20)(B) (Rehabilitation Act); ORS 659A.104.  The Amended Complaint contains allegations sufficient to establish that A.R. and B.C. and a substantial portion of the proposed class are qualified individuals with disabilities. (*See* ECF No. 5 (Am. Compl.) ¶¶ 72-73, 79-80, 111, 137.)  And the declaration of A.R. and B.C.'s guardian ad litem details their impairments.  (*See* Vangelisti Decl. ¶¶ 7, 19.)

Second, A.R. and B.C. can show that they were denied the benefits of or right to participate in a government program or service.  DHS is a "public entity" as defined by the ADA, 42 USC § 12131(1)(B), and "the broad language of Title II brings within its scope anything a public entity does."  *Cohen*, 754 F.3d at 695 (internal quotations omitted).  The law

_____

[20] Under the Rehabilitation Act, the plaintiff must also establish that the discriminatory program receives federal financial assistance. *Duvall v. County of Kitsap*, 260 F3d 1124, 1135 (9th Cir. 2001).

encompasses government activities even when they are involuntarily imposed upon the recipient. *See, e.g.*, *Penn. Dep't of Corrs. v. Yeskey*, 524 US 206, 213 (1998) (prison vocational programs). *See also Clark v. Cal. Dep't of Corrs.*, 123 F.3d 1267, 1271 (9th Cir. 1997) (permitting Rehabilitation Act claim against state prison to proceed); *Vanvalkenburg v. Or. Dep't of Corrs.*, No. 3:14-cv-00916-BR, 2016 U.S. Dist. LEXIS 58438, at *45 (D. Or. May 2, 2016) (analyzing a ORS 659A.142(4) (claim against a prison).  Accordingly, the fact that A.R. and B.C. did not likely request foster care services is irrelevant.  DHS still must provide children with disabilities an equal opportunity to access foster care services as it provides to children without disabilities.

With regard to the third prong, while states are not required to provide services to persons with disabilities that are not otherwise offered, they are required to provide meaningful access to the services they do provide.  *See, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003); *see also* ORS 659A.142(5)(c)(A) (providing that nondiscrimination provision does not create "independent entitlement to any service, program or activity of state government"). Moreover, DHS may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others[,]"  28 CFR § 35.130(b)(1)(ii), or "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. . . ." 28 CFR § 35.130(b)(1)(iii); *see also* 42 USC § 12134 (delegating ADA rulemaking authority);  *K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013) ("[T]he DOJ's Title II-implementing regulations should be given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.") (internal quotations omitted).

Disability discrimination includes conduct beyond explicit exclusion of people with disabilities from a government service or benefit.  A public entity has an affirmative duty, to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity[,]"  28 CFR § 35.130(b)(7), or result in undue financial or administrative burdens.  28 CFR § 35.164; *see also* ORS 659A.142(5)(c)(A) (providing for similar affirmative defenses of fundamental alteration or undue financial or administrative burdens).

For example, in *Cal. Council of the Blind v. Cty. of Alameda*, 985 F. Supp. 2d 1229 (N.D. Cal. 2013), a group of blind and visually impaired voters asserted claims under the ADA and Rehabilitation Act based on a county's failure "to ensure that voting machines accessible to the blind and visually impaired could be activated and operated by poll workers . . . ." *Id.* at 1232. Without such operable machines, plaintiffs could vote only with someone else's assistance. *Id.* The defendant county argued that plaintiffs were provided an "equal opportunity" to vote, with third party assistance. *Id.* at 1239.  The Court disagreed, explaining that "requiring blind and visually impaired individuals to vote with the assistance of a third party . . . at best provides these individuals with an inferior voting experience 'not equal to that afforded others.'" *Id.* at 1239 (citing 28 CFR § 35.130(b)(1)(ii).  To provide meaningful access to voting to blind and visually impaired people, the county had to proffer functional, accessible voting machines.

Likewise, children with mental disabilities in DHS' custody are receiving unlawfully inferior foster care services relative to their non-disabled peers when they are unplaced.  As set forth above, the regulatory hallmark and guiding force of foster care service is the child's

placement in a safe, stable, least restrictive and most family-like environment possible.  Just like

the blind voters in *Alameda* needed an accessible voting machine to put them on par with voters

without visual impairments, many foster children with disabilities need additional support to

make them as able as their non-disabled peers to access a stable, family-like foster placement.

Indeed, DHS itself recognizes that children with mental disabilities will often need more support

to function in the challenging environment of foster care.  (*Statewide Assessment* at 106

(describing "individualized behavior rehabilitation services plan for every child in a contracted

BRS (Behavior Rehabilitation Services) substitute care placement")).

   In its own words, however, DHS deems children with mental disabilities "Hard to Place"

and they comprise a strong majority of unplaced foster children.  (Sherbo Decl., Ex. 5 (Early

Data Spreadsheet).)  DHS must remove barriers to placement for children with disabilities so that

their disabilities do not result in their sleeping in hotels, offices, and hospitals.  Not to provide

those additional services necessary to provide children with mental disabilities a full and equal

opportunity to access foster care services constitutes discrimination.[21]  Without the support and

services they need to thrive in a stable, family-like foster placement, unplaced foster children

with mental disabilities are technically receiving 'foster care services,' but not services as

effective as those afforded non-disabled foster children.  28 CFR § 35.130(b)(1)(iii).

---

[21] *See, e.g.*, *Investigation of the Massachusetts Department of Children and Families by the United States Departments of Justice and Health and Human Services Pursuant to the Americans with Disabilities Act and the Rehabilitation Act*, DJ No. 204-36-216 and HHS No. 14-182176, *available at* https://www.ada.gov/ma_docf_lof.pdf.  The findings letter required that the state agency implement the services and supports appropriate to provide a woman who has a developmental disability a full and equal opportunity to seek reunification with her baby, who had been placed in foster care.

Courts sustain disability-based challenges to foster care systems that do not provide appropriate placements for children with disabilities.  The court in *Marisol A.*, for example, found a "failure to provide meaningful access to child welfare services" where a foster child with HIV/AIDS was "transferred . . . from one inappropriate placement to another including a group home that lacked the medical staff needed to monitor his condition," and where another foster child "remains in a group home unequipped to address his neurological problems . . . ."  929 F Supp at 685.  Such failures "raise serious questions as to whether [defendant] has fulfilled even its most fundamental obligation to provide meaningful access as required by the ADA and the Rehabilitation Act."  *Id.*  The same is true here.  Children with disabilities are not receiving meaningful access to foster care services when DHS renders them unplaced.

Notably, to prove their claim of disability discrimination, A.R. and B.C. do not need to show that their non-disabled peers *are* able to meaningfully access appropriate foster care placements.  For example, in *Henrietta D.*, the court found that the City of New York had denied people with HIV/AIDS the opportunity to access certain public benefits by failing to make reasonable accommodations.  331 F3d at 280.  The court rejected the City's argument that "others are equally unsuccessful in accessing benefits" because of a dysfunctional system.  *Id.* at 279. The plaintiffs proved their claim by demonstrating that they "face[d] conditions that [we]re more onerous for them because of their particular disabilities."  *Id.* at 280.  Here, DHS discriminates against children with mental disabilities by failing to provide meaningful access to appropriate placements by reasonably accommodating their disabilities, regardless of the fact that non-disabled foster children also struggle to access appropriate foster care placements.

Plaintiffs' Amended Complaint, and the record submitted in support, set forth compelling claims of disability-based discrimination from DHS' failure to provide appropriate placements for foster children with mental disabilities who need additional support to thrive in the family-like environment they deserve.  CASA may also sue for prospective injunctive relief based on DHS' disability discrimination against the children it serves.  *See, e.g.*, *Mont. Fair Hous., Inc. v. City of Bozeman*, No. CV 09-90-BU-RFC-CSO, 2011 U.S. Dist. LEXIS 153155, at *38-41 (D. Mont. Dec. 7, 2011) (rejecting standing challenge to organization's disability rights claims).

### 3. Defendants' resource limitations do not excuse their conduct.

Plaintiffs expect that defendants will insist that they lack the resources to avoid unplacing children in hotels, offices, or juvenile detention facilities.  Courts have rejected such arguments in similar cases.  This Court should, too.  The defendant in *Doe*, for example, agreed that shuttling children from and between emergency overnight facilities deviated from professional standards; but he argued that the program was adequate in the context of his department's limited resources and challenging circumstances.  670 F Supp at 1184.  Rejecting the argument, the *Doe* court explained that "[c]oncern . .. with the availability of resources is not part of the constitutionally acceptable decision-making process."  *Id.*  If it was, government actors could always eschew their constitutional responsibilities through purposeful underfunding.  *See also LaShawn A.*, 762 F Supp at 997 ("The Court is well aware of the District's financial plight, but this cannot relieve the District of liability for depriving the children in its foster care of their constitutionally protected liberty interests.").  Here, DHS may well experience financial and logistical difficulty in finding appropriate placements for the children in its care.  It is nonetheless obligated to do so under the Fourteenth Amendment and disability rights law.

### C.  The balance of hardships tips sharply in plaintiffs' favor.

Here, the balance of hardships tips sharply in plaintiffs' favor.  Absent injunctive relief, A.R. and B.C. are likely to become unplaced, shuttled between DHS offices and hotel rooms. (Vangelisti Decl. ¶¶ 17, 24.)  They will consequently suffer emotional and psychological injury. (Urquiza Decl. ¶¶ 15-16.)  Likewise, CASA for Children will continue to divert its scarce resources to address a crisis outside of its normal activities.  (Travis Decl. ¶¶ 34-48.)  On the other hand, any burden of an injunction on defendants will be administrative or financial.

When "[f]aced with such a conflict between financial concerns and human suffering," the Ninth Circuit has had "little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor."  *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983). *See also M.R.* v. *Dreyfus*, 697 F.3d 706, 737-38 (9th Cir. 2012) ("[T]he balance of hardship favors beneficiaries of public assistance who may be forced to do without needed medical services over a state concerned with conserving scarce resources."); *R.G.*, 415 F. Supp. 2d at 1162 (finding the "administrative inconvenience" of ensuring a safe environment for children in a state institution outweighed by the harm of children being subjected to harassment and abuse); *Turner v. Vilsack*, No. 3:13-cv-1900 SI, 2013 U.S. Dist. LEXIS 163701, at *15 (D. Or. Nov. 18, 2013) ("[T]he threat of homelessness . . . outweighs the USDA's loss of $7,000 per month.")  The same is true here.  Vulnerable, traumatized children should not be subjected to an unconstitutional and psychologically damaging practice because the state taking care of them has resource limitations.

The hardship balance tips particularly sharply in plaintiffs' favor where, as here, the injunction may well have a *beneficial* effect on the state's budget.  *M.R.*, 697 F.3d at 783. Housing children in hotels, paying multiple staff to work overtime, overnight, repeatedly, is

expensive.  The children at issue in this lawsuit be better served by DHS re-allocating resources

away from non-placements towards stable, safe foster homes; DHS may well be, too.

### D.  Granting a preliminary injunction is in the public interest.

"The public interest inquiry primarily addresses impact on non-parties rather than

parties."  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).

"Generally, public interest concerns are implicated when a constitutional right has been violated,

because all citizens have a stake in upholding the Constitution."  *Rodriguez v. Robbins*, 715 F.3d

1127, 1146 (9th Cir. 2013) (internal quotations omitted).  Likewise, because "[i]n enacting the

ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication

of discrimination on the basis of disabilities[,]" a preliminary injunction that requires entities to

"take steps to 'assure equality of opportunity' for people with disabilities" effectuates the public

interest.  *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc., Inc*., 630 F.3d 1153, 1167 (9th Cir. 2011).

*See also Turner*, 2013 U.S. Dist. LEXIS 163701, at *20 (finding a public interest in ensuring

government entities "meet the purposes and goals" of regulations to which they are subject).

Here, there is a compelling public interest in defendants' ending an unlawful practice

deleterious to the mental health of children in DHS' care and disruptive of a valuable non-profit

organization's work.  As set forth above, the unplacing at issue in this litigation is contrary to

state and national standards.  It is contrary to the regulatory web in which DHS operates, which

emphasizes the primary of placement in a family-like environment and imposes licensing

requirements on foster care providers.  Unplacing "is not a practice considered acceptable in the

foster care field" and "it is not part of the consensus in Oregon about how to treat foster

children."  (Travis Decl. ¶ 22.)  It is harmful to vulnerable children, and constitutes "a social

service response which is opposite from that which they need." (Urquiza Decl. ¶ 15.) When DHS removes children from their homes, it must care for them in the manner proscribed by law, DHS' own rules, and experts in the field. The injunction plaintiffs seek will make sure it does.

### E. Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction.

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation omitted); *see also Chalk v. Orange County Superintendent of Schs*., 840 F.2d 701, 710 (9th Cir. 1988) (emotional and psychological harm arising from a violation of disability rights law is irreparable in the context of a preliminary injunction). Given plaintiffs' constitutional and statutory claims, the psychological and emotional injury arising out of unplacement is irreparable harm sufficient to support a preliminary injunction.

Plaintiffs must show that such harm is 'likely' absent injunctive relief, not merely a possibility. *Winter*, 555 U.S. at 22. However, "while 'likely' is a higher threshold than 'possible,' the [plaintiff] need not prove that irreparable harm is certain or even nearly certain." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011). In *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 970 (D. Ariz. 2011), for example, plaintiffs – individual Latino people who had been stopped or detained pursuant to defendants' allegedly unconstitutional policy, represented a putative class of "[a]ll Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by [defendants'] agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona." (Internal quotations omitted). The court explained that while "[t]he likelihood that any particular

named Plaintiff will again be stopped in the same way may not be high[,]" plaintiffs' exposure to the policy "is both itself an ongoing harm and evidence that there is 'sufficient likelihood' that Plaintiffs' rights will be violated again[,]" warranting injunctive relief. *Id.* at 979.

Likewise, A.R. and B.C., who already suffered the injury of unplacement, will likely be unplaced again absent preliminary injunctive relief. Not only do they have mental disabilities that make them "Hard to Place" in DHS' view, and thus vulnerable to unplacement (*see* Vangelisti Decl. ¶¶ 7, 19; Sherbo Decl., Ex. 5 (Early Data Spreadsheet)), they also have already been unplaced. According to DHS' own (flawed, incomplete) data, one incident of unplacement is strongly predictive of another incident; 34% of the unplacement instances set forth on its spreadsheet involved children who had been unplaced more than once. (Urquiza Decl. ¶¶ 22-25.) A.R. and B.C.'s risk of unplacement is far greater, and more particularized, than the risk facing individual Latinos in *Ortega-Melendres* who had been stopped while in a vehicle on a roadway or parking area in Maricopa County and might again find themselves in such a position.

Moreover, where a plaintiff suffered an actual injury resulting from a government agency's pattern of officially sanctioned unlawful behavior, she has demonstrated a likelihood of imminent injury sufficient to warrant prospective injunctive relief. *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001). *See, e.g.*, *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) (finding a likelihood of imminent injury sufficient to support an injunction where the injury resulted from an unconstitutional citation policy, even though "we are dealing with a relatively small number of citations of only fourteen individual plaintiffs in this case"). That is precisely the case here. A.R. and B.C. have both been unplaced pursuant to DHS' pattern of unplacing publicly sanctioned by DHS' top officials.

In addition, absent a preliminary injunction, CASA for Children will, with near certainty, suffer irreparable injury in the form of dozens of lost volunteer and staff hours spent supporting unplaced children.  (Travis Decl. ¶¶ 38-48.)  *See Arc of Cal. v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014) (finding likelihood of irreparable injury, and granting preliminary injunction, to organization challenging reduced payments for services to people with disabilities).

Courts consistently issue preliminary relief like that sought by plaintiffs, to enjoin unconstitutional practices affecting children in state custody.  *See, e.g.*, *R.G.*, 415 F Supp 2d at 1135, 1162 (granting preliminary injunction ordering defendants, state actors operating an institution for 'delinquent' children, to retain a mutually agreeable expert to guide them in reforming pervasive abuse of LGBT children in custody); *Doe*, 670 F Supp at 1185 (granting preliminary injunction to plaintiff foster children "[g]iven the inadequate conditions which characterize the night-to-night program, and the deterioration suffered by repeat overnighters").  The Court should do so here as well.  Oregon's foster children deserve appropriate placements.

### F.  Plaintiffs' motion warrants statewide relief.

"While injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification, an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit - even if it is not a class action - *if such breadth is necessary to give prevailing parties the relief to which they are entitled*."  *Hannigan*, 92 F.3d at 1501-02 (9th Cir. 1996) (emphasis original; internal quotations and citations omitted).  In *Hannigan*, the entire California Highway Patrol was enjoined from issuing certain citations to all motorcyclists, not just to the named plaintiff motorists.  *Id.* at 1502.  Similarly, in *Justin v. City of L.A.*, No. CV-00-12352 LGB (AIJx), 2000

U.S. Dist. LEXIS 17881, at *9 (C.D. Cal. Dec. 5, 2000), the court granted homeless plaintiffs an injunction barring defendants from unlawfully harassing all homeless people on Skid Row.

The same logic applies here.  Unplacing is becoming DHS' safety net.  Plaintiffs challenge that 'safety net' as unlawful and have sued to prohibit its use.  Accordingly, A.R. and B.C. will not receive the complete relief to which they are entitled – a cessation to the unlawful practice of unplacing – if the applicability of the injunction is narrowed to them alone.

Moreover, while CASA for Children focuses its work on three counties, it serves children all over the state because it continues to work with children who are moved outside its service areas.  (Travis Decl. ¶ 48.)  The only way to avoid irreparable injury to CASA for Children's resource diversion resulting from unplacement is to end the practice statewide.

### G.  The Court should waive the bond requirement.

A district court may dispense with the bond requirement under Fed. R. Civ. P. 65(c) in numerous circumstances, including where requiring security would effectively deny access to judicial review or where the plaintiff is indigent.  *Featherstone v. Pac. Nw. Univ. of Health Scis.*, No. 1:CV-14-3084-SMJ, 2014 U.S. Dist. LEXIS 102713, at *20-21 (E.D. Wash. July 22, 2014).  Plaintiffs are indigent foster children and a non-profit organization that cannot post a bond.  (Travis Decl. ¶¶ 49-50.)  Plaintiffs request that the Court waive the security requirement associated with compelling defendants to fulfill their constitutional, and statutory, obligations.

## IV.  CONCLUSION

For the reasons stated above, the Court should grant plaintiffs' motion for a preliminary injunction stopping DHS' unplacing practice while this litigation is pending.

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,746 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 7th day of October, 2016.

OREGON LAW CENTER

/s/ Emily Teplin Fox

_____
Emily Teplin Fox, OSB No. 121720
efox@oregonlawcenter.org
Ryan Newby, OSB No. 114724
rnewby@oregonlawcenter.org
Ed Johnson, OSB No. 965737
ejohnson@oregonlawcenter.org
522 SW 5th Ave, Suite 812
Portland, OR  97204
(503) 473-8310

YOUTH, RIGHTS & JUSTICE

Angela Sherbo, OSB No. 824472
Angela.S@youthrightsjustice.org
1785 NE Sandy Blvd., Suite 300
Portland, OR 97232
(503) 232-2540

Of Attorneys for Plaintiffs