Emily Teplin Fox, OSB No. 121720
efox@oregonlawcenter.org
Ryan Newby, OSB No. 114724
rnewby@oregonlawcenter.org
Ed Johnson, OSB No. 965737
ejohnson@oregonlawcenter.org
OREGON LAW CENTER
522 SW 5th Ave, Suite 812
Portland, OR 97204
(503) 473-8310

Angela Sherbo, OSB No. 824472
Angela.S@youthrightsjustice.org
YOUTH, RIGHTS & JUSTICE
1785 NE Sandy Blvd., Suite 300
Portland, OR 97232
(503) 232-2540

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| A.R., a minor child, and B.C., a minor child, by their guardian ad litem RICHARD VANGELISTI; on behalf of themselves and all others similarly situated; and CASA FOR CHILDREN, INC., an Oregon not-for-profit organization, Plaintiffs, <br><br>v.<br><br>STATE OF OREGON by and through its DEPARTMENT OF HUMAN SERVICES; CLYDE SAIKI, in his official capacity as Director of the Oregon Department of Human Services; and REGINALD C. RICHARDSON, in his official capacity as Deputy Director of the Oregon Department of Human Services, <br><br>Defendants. | Case No. 3:16-cv-01895-YY<br><br>**DECLARATION OF SCOTT W. LEE**<br><br>**In Support of Plaintiffs' Motion for Certification of a Class and in Opposition to Defendants' Motions to Dismiss** |

I, SCOTT LEE, J.D., do hereby declare:

1. I am the current Program Attorney at CASA for Children, one of the plaintiffs in this case. I have been in this position since April 2017.

2. CASA for Children recruits, trains, and supervises volunteer Court Appointed Special Advocates (CASAs) for dependent children under juvenile court supervision in Multnomah, Washington, and Columbia counties.

**Experience with foster children and foster care practices in Oregon**

3. I have been a member of the Oregon State Bar since 1999. My entire practice has focused primarily on juvenile law. From February 2000 to September 2002, I was an attorney with Bertoni & Todd and I managed a high case load representing parents and children in dependency cases and termination of parental rights proceedings.

4. I was a member of Native American Program of Legal Aid Services for over four years. I had an average case load of 60-80 dependency cases. Many of my cases involved the Indian Child Welfare Act and focused on the welfare and placement of Native American children.

5. From September 2002 to November 2004, I was a Board Member at Juvenile Rights Project (now Youth, Rights & Justice).

6. I have represented parents and children in approximately 800 dependency cases. When I represented children, I was ethically bound to visit them in their placements. Evaluating the appropriateness of each placement was integral in every case.

7. I have litigated a variety of issues related to safety and well-being of children in DHS custody including:

2- DECLARATION OF SCOTT W. LEE

- The limits of the juvenile court's and DHS's authority to determine foster care or permanent placements.

- Emergency court reviews to address safety concerns in current placements.

- DHS's obligation to make reasonable efforts to place children with relatives or in the least restrictive placement.

- The rights of siblings to be placed together.

- Culturally appropriate services and placements.

- The rights of current, non-relative caretakers to pursue adoption or permanent placement when a relative is also seeking placement.

- The application of the Interstate Compact on Placement of Children.

- Challenges to foster care certification decisions.

8.  In addition to in-court representation, I have advocated for children and CASAs at DHS administrative proceedings such as sibling planning and adoption committees and administrative appeals.

9.  From December 2013 to April 2017, I was employed as a Supervisor at CASA For Children. On average, I was responsible for supervising approximately forty CASAs at a time. Each CASA was appointed as a legal party on a dependency case involving significant abuse or neglect and was responsible for doing monthly home visits with their assigned child or children.

10. As a CASA Supervisor, I would help the CASA monitor the child's education, mental health needs, visitation with parents, and case plan. Assessing the appropriateness of the child's placement was a standard part of our discussions. Assessing a parent's

3- DECLARATION OF SCOTT W. LEE

engagement in reunification services, attachment to their children, and whether their home was minimally adequate are also standard areas of focus.

11.     In CASA for Children's last fiscal year, the program supported 489 volunteer CASAs advocating for 1072 children, 90% of whom were in either Multnomah or Washington County. CASAs make monthly home visits (sometimes more) with children in foster care and commit to advocating for their assigned children for the duration of the juvenile court proceeding.

12.     In my current and previous positions at CASA for Children, I frequently hear about and discuss the placement of Oregon foster children.

**Oregon's standards and consensus on foster care placement priorities and the new practice of unplacement.**

13.     Based on my years of experience working in the Oregon foster care system, there are standards and a basic consensus among those involved in the system about where and how to place children in state custody. One such standard or consensus is that placements must be in the least restrictive and most home-like environment that serves the child's needs.

14.     Housing children in hotels or state office buildings, let alone juvenile detention facilities without charge, are not placements contemplated by any national or Oregon standard for foster care with which I am familiar. The practice of "placing" foster children in unlicensed facilities that are inherently transitory – what I'll call 'unplacement' – is not a practice considered acceptable in the foster care field. It is not part of the consensus in Oregon about how to treat foster children.

4-    DECLARATION OF SCOTT W. LEE

15. It is my understanding that most children that are placed in hotels do not typically go to school on a consistent basis.

16. I am unaware of any specific mental health supports which are provided by DHS to help support the youth who live out of a hotel. To the contrary, being unplaced, a child risks missing out on crucial medical or mental health support. A CASA Supervisor staffed one case with me recently, and the unplaced child had not been to any mental health counseling or school for five weeks. She had access to, and participated in, mental health counseling at her previous placement. This child has thrown away her medication and has been un-medicated for two days; it is unknown when she will get a new prescription.

17. I have come to learn that many children are not going to school and many children are spending the bulk of their days at the DHS office or with Greater New Hope staff. I am aware of occasions since last fall where an unplaced child spent the day sitting in a DHS office, listening while a social worker made calls to find the child a placement. In one of the most egregious cases, the unplaced child had spent the vast majority of her five weeks at the DHS office.

18. Some unplaced children are completely unsupervised and using illicit drugs during the day.

19. It is my understanding that many of these unplaced children are eating fast food meals for breakfast, lunch, and dinner; I have learned about two children who have gained 10-20 pounds since being unplaced.

5- DECLARATION OF SCOTT W. LEE

20.     Other unplaced children have attempted to run away from their DHS or Greater New Hope supervisor.

21.     I am unaware of any enriching activities or services which DHS makes available to children while they are living out of a hotel. My understanding is that they spend most of their time watching television or at DHS offices. There are only sporadic and random activities for children who are not in school.

22.     My understanding is that the individuals who are with the unplaced children in the hotels are not necessarily licensed foster parents. Often they are the child's DHS caseworker, Greater New Hope employees, or church volunteers. My understanding is that such caretakers rotate, in shifts.

23.     Not having a consistent caregiver who is a licensed foster parent is a threat to foster children's safety, in my view. For example, I am aware of one case in Multnomah County two months ago where an unplaced child with acute behavioral and mental health issues locked his caretakers out of the hotel room for approximately one hour. The child could have done himself serious harm in that hour. In my experience, leaving a child with severe behavioral and mental issues alone, in a hotel room, is anathema, in large part because of safety concerns. Another CASA informed me about an unplaced child who tried to throw herself out of a third-story window. A DHS case worker was able to prevent this suicide attempt but was injured in the process. Certified foster parents are trained in such safety issues, and many are specially certified to work with children with challenging behavioral issues.

6- DECLARATION OF SCOTT W. LEE

24. For as long as I have worked in the foster care field, Oregon's foster children have often presented complex challenges including trauma, mental and emotional health concerns, and mental and physical disabilities. A sudden, unexpected need for a new placement for a foster child is not particularly unusual. Finding appropriate placements has always been a challenge.

25. However, prior to the summer of 2016, DHS did not typically handle such challenges by unplacing foster children.

26. Before last summer, I would have considered DHS' unplacement of a foster child a 'black swan' event. It was extremely rare. In my 15 years of practice in the foster care system, I can only think of a few isolated examples of unplacement in Oregon prior to last summer: an emergency removal at the dead of night or some weather-related emergency.

27. Since last summer, however, unplacement has become increasingly normalized in Oregon. Many of the children CASA for Children serves have spent days, or even weeks, unplaced. One of these children is so comfortable around the DHS office that she walks around barefoot and knows many of the case workers on a first name basis.

28. This trend troubles me deeply. Unplacement goes against everything I know about what foster children need and accepted practices in the field. Based on my knowledge of and experience with Oregon's foster children, their needs, and best practices in the field, DHS' practice of housing children in hotels (and the previous practice of housing children in offices and other unlicensed facilities) is extremely harmful to foster children's mental health and development.

7- DECLARATION OF SCOTT W. LEE

**Continuing effect of unplacements on CASA for Children**

29. In her declaration of Ocotober 5, 2016, Lynn Travis, who previously held my position, described how DHS' unplacement practice is not only frustrating the mission of CASA for Children but is also entirely contrary to our mission, and how we have had to divert significant resources from our regular activities to address unplacements. I agree with her statements about the diversion of CASA for Children's resources and frustration of our mission. They are still true today.

30. From my hundreds of conversations with CASAs and others involved in foster child placements, I am aware of several instances since last fall when DHS did not inform a CASA that her child had been placed in a hotel within one business day of the unplacement.

31. For example, three children were removed from a parent on March 26, 2017. The CASA was informed by a parent that one of the children had been unplaced on March 27th. Despite sending several messages to the case worker, including specific inquiry regarding whether or not the child was in a hotel, the CASA was not given any information about the unplacement for several days. Since this was the CASA's first case, she was extremely worried and concerned about the child; the CASA was also worried that she was not doing an adequate job on her case. On April 4th, the CASA's CASA Supervisor, who had been on vacation, returned to work and spent a few hours communicating with the CASA to understand the situation. The CASA Supervisor then spent some time communicating with the DHS case worker and the DHS supervisor in an attempt to clarify and understand where the child had been for the last several days. Even

8- DECLARATION OF SCOTT W. LEE

the CASA Supervisor had a difficult time getting a definitive answer from DHS about whether or not the child had been unplaced and it was not until April 5th, when the CASA was finally given placement information for the child.

32. It is impossible to effectively advocate for a child, let alone even visit a child, if you do not know where that child is placed.

33. Since CASAs become invested in their cases and are emotionally attached to their assigned families, they often panic and worry if they are unable to locate their child. The CASA Supervisor helps them work through this emotional process and the CASA Supervisor may contact the DHS case worker or DHS supervisor if the CASA does not receive a timely response. This all takes additional time which detracts from other advocacy work. A CASA volunteer's frustration with this process can cause them to become jaded, angry, or fed up with working with DHS and they may decide to quit working with our program.

34. Even when DHS does timely inform a volunteer CASA that a child has been unplaced, the unplacement still results in a diversion of our resources and frustration of purpose.

35. CASA volunteers are frequently frustrated by the lack of communication from DHS case workers when a child has been unplaced, and CASA Supervisors spend more time and energy working with their volunteers on these cases than other cases that do not involve the child living out of an office or hotel.

36. When a CASA becomes aware that her child has been unplaced, the CASA focuses all of her advocacy efforts on finding a placement for the child. As a result, the

9- DECLARATION OF SCOTT W. LEE

CASA postpones, or is forced to ignore, the advocacy for the child she would otherwise focus on. Planning for education, parent and sibling visitation, mental health counseling, and extra-curricular activities fall to the wayside. The child cannot meaningfully participate in any of these activities if they are living in a hotel.

37.  For example, there is no purpose in developing a good relationship with a therapist for much-needed psychiatric treatment, or advocating for such treatment, when no one even knows where the child is going to live. The child might have to start from scratch with a new provider depending on her next placement location, resulting in a setback to the therapeutic process.

38.  CASAs do not typically understand why their assigned child is unable to be placed in a foster home and is instead placed in a hotel. CASA Supervisors will spend extra time analyzing why the child was not successful in previous placements. The CASA and CASA Supervisor will spend additional time reviewing the file and investigating whether there are any other placement options for the child. Typical investigation regarding placement options generally involves speaking with the child, past foster families, extended relatives, DHS case workers, and the legal parties. CASA Supervisors may also spend additional time explaining why the CASA is not allowed to supervise the child alone pursuant to office policy.

39.  Since DHS case workers have become aware of CASA's driving policy, DHS case workers often ask CASAs to drive the child to appointments even if the CASA was unaware of the driving policy. A CASA volunteer may then ask their Supervisor to be approved to drive the CASA child. This process becomes more difficult and time-

consuming when the CASA child is living in a hotel. The CASA Supervisor may have to staff the case with the CASA Program Manager and CASA Program Director to analyze the liability risks and the benefits.

40.    Unless DHS ends its unplacement practice immediately, CASA for Children will continue to divert significant volunteer and staff time to monitoring and supporting crisis placements. Our normal activities, securing and advocating for permanent homes for children, will continue to be significantly hampered.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on this 15th day of June, 2017.

_____
SCOTT LEE

11- DECLARATION OF SCOTT W. LEE