Emily Teplin Fox, OSB No. 121720
efox@oregonlawcenter.org
Ryan Newby, OSB No. 114724
rnewby@oregonlawcenter.org
Ed Johnson, OSB No. 965737
ejohnson@oregonlawcenter.org
OREGON LAW CENTER
522 SW 5th Ave, Suite 812
Portland, OR 97204
(503) 473-8310

Angela Sherbo, OSB No. 824472
Angela.S@youthrightsjustice.org
YOUTH, RIGHTS & JUSTICE
1785 NE Sandy Blvd., Suite 300
Portland, OR 97232
(503) 232-2540

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| A.R., a minor child, and<br>B.C., a minor child, by their guardian ad litem RICHARD VANGELISTI; on behalf of themselves and all others similarly situated; and<br>CASA FOR CHILDREN, INC., an Oregon not-for-profit organization,<br>Plaintiffs,<br><br>v.<br><br>STATE OF OREGON by and through its DEPARTMENT OF HUMAN SERVICES; CLYDE SAIKI, in his official capacity as Director of the Oregon Department of Human Services; and<br>REGINALD C. RICHARDSON, in his official capacity as Deputy Director of the Oregon Department of Human Services,<br>Defendants. | Case No. 3:16-cv-01895-YY<br><br>**DECLARATION OF EMILY S. COHEN**<br><br>**In Support of Plaintiffs' Motion for Certification of a Class and in Opposition to Defendants' Motions to Dismiss** |

I, EMILY S. COHEN, do hereby declare:

1. I am an attorney in private practice in Multnomah County, Oregon. I graduated from Lewis and Clark Law School in 1987 and I was admitted to the Oregon State Bar the same year. I am also a member of the bar of the District Court of Oregon and of the Ninth Circuit Court of Appeals.

2. I served on the Board of Bar Examiners from 1995-1998 and on the Bar Examination Review Board from 2000-2002. In 2002, I served as the chair of that board.

3. I was the chair of the Executive Committee of the Juvenile Law Section of the OSB in 2006-2007 and served on the committee for a total of five years. I authored the chapter on permanency hearings in the current OSB Juvenile Law CLE and am co-authoring the chapter on guardians-ad-litem in the next version of the CLE, which is in production now.

4. I have represented parents, children, and foster and adoptive parents involved in Oregon's child welfare and juvenile dependency systems since 1989. In addition to representing parents and children in dependency and termination of parental rights cases, I represent children in domestic relations cases and in probate guardianships. I have been appointed by juvenile courts throughout the state to serve as guardian-ad-litem for foster children who have serious and often life-threatening illnesses. I am often appointed in Multnomah County to serve as the guardian-ad-litem for a parent in a juvenile court case where the court has made a finding that due to the parent's disability or impairment, the parent "lacks substantial capacity either to understand the nature and consequences of the proceeding or to give direction and assistance to the parent's attorney...." I also represent

2-  DECLARATION OF EMILY S. COHEN

third parties (intervenors) in juvenile court proceedings and have represented parents and foster parents in contested case administrative hearings regarding their DHS certification or benefits. For a period of about 15 years I also represented parties to juvenile court cases in the Court of Appeals.

5. I estimate that I have represented a thousand children or parents in juvenile court proceedings in Oregon. Many of these cases last for years and some for decades. Because of this, I have longstanding relationships with many of my clients and have visited them in countless individual foster homes, group homes and treatment facilities. Recently, I have also visited some of them in hotels.

6. I am also a foster parent and have been one for over 25 years. Many of the children I have fostered have remained in my home for a period of years. Many of my foster children, all girls, have had serious emotional and behavioral disorders. Several came to my home directly from a residential treatment facility or hospital. I have taken care of children with depression who engaged in self-harming behavior. I also fostered girls who were oppositional and angry. I have attended countless intake and other appointments with mental health professionals with my foster daughters and I have made multiple emergency room visits with them. I have a 15 year-old foster child now.

7. I keep current on issues in juvenile law and dependency practice by attending CLEs, including the annual Juvenile Law Academy and the annual CLE presented by the Juvenile Law section of the Bar. Because I represent children in Multnomah County domestic relations cases, I also attend the trainings made available to practitioners by that project. I make it a practice to read the increasing number of Oregon appellate cases in

3-   DECLARATION OF EMILY S. COHEN

the dependency and termination of parental rights fields, which often discuss the services DHS provided to the parties in the case.

8. As a foster parent, I am required to participate in 30 hours of on-going training every two years. I attend many issue-specific trainings and annually attend the "Shoulder to Shoulder" conference, which brings a multi-disciplinary approach to issues affecting children in foster care.

9. The Multnomah County juvenile bench hosts frequent practitioner meetings to discuss a wide variety of issues. I attend these meetings as well.

10. Because both state and federal law require DHS to make "reasonable efforts" to keep families together ("active efforts" in cases governed by the Indian Child Welfare Act), the array and intensity of services provided to both my adult and child clients is an issue that must be addressed in every case.

11. On behalf of my clients, I routinely argue for more services, a wider array of services and a greater intensity of services, when needed. Because I do this, I am acutely aware of the kinds of services routinely provided to families and the limitations on DHS' ability to provide additional services.

12. I have read several of the filings in this case as they relate to the services provided to A.R. and B.C. Specifically, I have read the October 5, and 13, 2016, Declarations of Richard Vangelisti (ECFs # 9, 25), the October 24, 2016 and May 23, 2017, Declarations of Kellie Barber (ECFs #36, 59), the May 23, 2017, Declaration of Anani Kuffner (ECF # 55) and the May 22, 2017, Declaration of Erin Wirtz. ECF # 58.

4- DECLARATION OF EMILY S. COHEN

13. From the declaration of B.C.'s guardian-ad-litem, I learned that by the time B.C. was six-years-old, she had already been diagnosed with post-traumatic stress disorder, adjustment disorder with mixed disturbance of emotions and conduct, anxiety disorder, disruptive behavior disorder and physical abuse of a child. ECF #9 at ¶ 7. Her mother, a single parent, also suffers from serious mental health problems, resulting in several hospitalizations during B.C.'s life. *Id.* at ¶ 8. I learned that B.C. was taken into foster care after an incident of physical abuse by her mother and that during her first two months in DHS custody, B.C. spent the night in at least 8 different places, including a hospital emergency room, three or more different hotels and a psychiatric hospital. *Id.* at ¶ at 10, 13. I also learned that the report of child abuse that resulted in B.C.'s placement in foster care was the 20th such report in approximately three years. *Id.* at ¶ at 11.

14. From the declaration of Kellie Barber (ECF # 36), I learned that B.C. was placed in a non-relative foster home on July 19, 2016, and remained there through the date of Ms. Barber's declaration, October 24, 2016. Ms. Barber described the services B.C. was receiving as "mental health therapy, psychiatric services, medication management and counseling." *Id.* at ¶ at 12. She also received additional services, described as on-call crisis response (as needed), transportation services and 1:1 supervision in the home every night through a contract with Greater New Hope." *Id.* According to the declaration, it was Ms. Barber's opinion that B.C.'s placement was stable. *Id.* at ¶ at 14.

15. I also reviewed the later declaration of Erin Wirtz, (ECF #58), which was said to be made to "update the facts regarding B.C." in Ms. Barber's October declaration. According to Ms. Wirtz, she is the caseworker assigned to B.C. and that, until May 12,

2017, when B.C. was returned to her mother, she remained in the same non-relative foster home that she was in at the time of Ms Barber's declaration. *Id.* at ¶ at 3.

16. According to Ms. Wirtz, B.C. will receive wraparound services in her mother's home. The services are coordinated by a "very organized team of professionals." The services are: a primary therapist, regular care from a psychiatrist, two to three skills-trainer sessions per week, respite care and "a trained GNH staff member [who] continues to be with B.C. from after school until approximately midnight and almost all day on the weekends." *Id.* at ¶ at 4,5.

17. I was surprised to read that B.C.'s caseworker is of the opinion that B.C.'s current placement is "stable and she is not reasonably at risk of being temporarily lodged in a hotel." ECF# 58 at ¶ 10. I consider the following facts, taken from the declarations, to suggest that that B.C.'s current placement with her mother is more accurately characterized as precarious than stable: 1) prior to coming into foster care, B.C. was the subject of 20 documented reports of abuse and neglect; 2) from an early age, B.C. has been diagnosed with serious mental health issues; 3) B.C.'s mother has a serious mental health diagnosis and she was hospitalized at times during B.C.'s young life; 4) B.C.'s school placement (Pioneer) is the most restrictive and highly staffed school in the Portland Public School District; and, 5) B.C needed daily 1:1 contracted support in foster care.

18. I also know from my experience that for children like B.C., any change in routine, even a return to a parent, can be a seriously destabilizing event.

6- DECLARATION OF EMILY S. COHEN

19. Based on my 28 years of practice and 25 years as a foster parent, I believe the facts recited above (in paragraphs 17 and 18) are more likely to be associated with placement instability and placement disruption than they are to be associated with placement stability.

20. I have never had a client who received months and months of one-on-one support for over 50 hours each week as a means to provide stability while in a foster home or with a parent. In my opinion this degree of intensity (50 hours per week) is, if offered at all, a service that would be used in a dire emergency and for an extremely limited time. Month after month of services of this intensity is something I have never heard of being provided to any other child. The intensity and, especially the duration, of these services is extraordinary.

21. From the declaration of A.R.'s guardian-ad-litem (ECF #9), I learned that by the time A.R. was four-years-old, she had been diagnosed with "adjustment disorder with mixed disturbances of emotions and conduct and mixed receptive-expressive language disorder, by history." *Id.* at ¶ 19. She was placed in foster care with her younger brother when she was only 20- months-old. She was removed from that foster home on August 16, 2016 and by October 5, 2016 was on her third foster home. *Id.* at ¶ 23.

22. According to the declaration of Kellie Barber, A.R. was hotelled during this time. While she was at the hotel at night she was "cared for by two DHS workers" and during the day she was cared for by Greater New Hope staff. ECF# 36 at ¶ 17.

23. Currently A.R. is in foster care and receives an array of services including "therapy visits in the community two to three times a week, 24/7 on call therapeutic support, and a

7-   DECLARATION OF EMILY S. COHEN

weekly skills trainer." ECF #55 at ¶ 6. She receives "medication management from a psychiatrist for the medication she has been prescribed to treat her PTSD." *Id*. at ¶ 7. A.R. goes to pre-school and has an "Early Childhood specialist who visits her there almost weekly. *Id*. at ¶ 8.

24. A.R.'s services, while not as intensive as B.C.'s, amount to virtually daily assistance from either a therapist, skills trainer or specialist, in addition to a pre-school program and a foster home with no other children. This is an impressive and highly unusual array of services, especially for a child this young.

25. In contrast to A.R.'s caseworker, who believes her placement is stable, I believe that the following factors are more likely to predict instability: 1) the intensity and length of the services provided to A.R. to maintain her in the current home; 2) her history of increasing dysregulation in her previous foster home resulting in her loss of that placement; 3) her separation from her brother; and 4) the fact that her current foster mother is not committed to being her permanent placement.

26. In my 25 years as a foster parent, I have never received services for my children that were anywhere near the duration (and frequency, intensity and array) that the foster parents for A.R. and, particularly, B.C. received.

27. The array of long-term, intense and varied services DHS has provided A.R. and B.C. would benefit the many other children in DHS custody that I know to have equally, or even more, complex needs. Sadly, it is my opinion that the services that have been provided to B.C. and A.R. differ in array, frequency, intensity and especially duration from the services routinely provided to other children in DHS custody.

8-   DECLARATION OF EMILY S. COHEN

28. I do not believe it is possible to predict whether any particular foster child will remain in a particular foster home or with a biological parent once returned. Based on my experience as both a lawyer and foster parent, the following events, among many others, can create the need to move a child: a parent relapses; a parent has a mental health crisis; the child's emotional needs require a higher degree of skill than the parent or foster parent can provide; a child's behaviors require a different caregiver; conflict among children in the foster home requires one or more to be placed elsewhere; abuse or suspected abuse or neglect by either the parent or foster parent requires DHS to move the child from the home; a foster parent "retires"; a foster parent is decertified; a parent or foster parent becomes ill or even dies, another member of the foster family becomes ill or dies, the foster family moves from the area etc. Any of these events could occur and cause an unexpected placement disruption for A.R., B.C. or any other foster child.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on this ___21___ day of June, 2017.

_____
EMILY S. COHEN

9-   DECLARATION OF EMILY S. COHEN